UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

RICHARD JOHNSON, on behalf of himself and
all others similarly situated,

                    Plaintiff,

          v.

BUCK MASON, INC.,

                    Defendant.

-----------------------------------------------------------------

Docket No.

**CLASS ACTION
COMPLAINT
& DEMAND FOR JURY
<u>TRIAL</u>**

Plaintiff, RICHARD JOHNSON, ("Plaintiff" or "Mr. Johnson"), on behalf of himself and all others similarly situated (collectively, "Plaintiffs"), by and through their undersigned counsel, JOSEPH & NORINSBERG, LLC, as and for their putative class action complaint upon Defendant, BUCK MASON, INC ("BUCK MASON" or "Defendant"), hereby alleges as follows:

<u>**INTRODUCTION**</u>

1.    Plaintiff, RICHARD JOHNSON, is a resident of Bronx County, New York, and as documented by Dr. Eleonora Orloff, O.D., is permanently disabled due to Proliferative Diabetic Retinopathy ("P.D.R.") resulting in profound central vision loss. Plaintiff is a visually-impaired and legally blind person who requires screen-reading software to read website content while using his computer. *(Exhibit A – RICHARD JOHNSON - Low Vision Evaluation Report, dated 9/10/2025).* Plaintiff uses the terms "blind" or "visually-impaired," as his central visual acuity with correction is less than or equal to 20/200. These findings meet the statutory definition of legal blindness under both federal and New York State law. (See *Exhibit A*)

2.    Due to his permanent and progressive visual impairment, Mr. Johnson relies

1

exclusively on screen-reading software, including JAWS and/or NonVisual Desktop Access ("NVDA"), to navigate digital interfaces, read product information, and complete online transactions. His dependence on assistive technology is not optional—it is essential to his ability to access goods and services on equal terms with sighted consumers. NVDA's ability to interpret properly coded websites is critical to his independence, safety, and daily functioning.

3.  Plaintiff brings this civil action against **Buck Mason, Inc.**, which operates the public-facing retail website www.buckmason.com,  a national e-commerce platform offering men's and women's apparel, denim, outerwear, and accessories. The Website serves as Buck Mason's primary online storefront and also links to and provides information about the company's brick-and-mortar retail locations, including multiple New York City stores (for example, SoHo, Nolita, West Village, Flatiron, and Williamsburg), which are listed on the site's "Our Stores" page and used by customers to locate in-store inventory and services. For individuals who rely on assistive technology, the Website—both as an online sales channel and as the gateway to Buck Mason's physical stores and in-store services—is essential to participating in the retailer's offerings on equal terms with sighted users.

4.  For a significant portion of Americans, accessing websites, mobile applications, and other information via smartphones has become a necessity rather than a convenience. Unlike the largely stationary internet of the early 2000s, today's Americans are increasingly connected on the go. The widespread adoption of this technology is staggering: according to the Pew Research Center, 96% of Americans now own a cellphone of some kind, and smartphone ownership has climbed from just 35% in 2011 to 85% in 2024 — amounting to more than 365 million people in the United States.

2

5.      Indeed, a growing share of Americans now rely on smartphones as their primary means of online access at home. Roughly one in five adults are "smartphone-only" internet users — owning a smartphone but lacking traditional home broadband service. [1]

6.      The growth of smartphone usage is matched only by the myriad ways in which Americans harness the internet to improve their lives — through education, employment, entertainment, commerce, and countless other pursuits. The U.S. Chamber of Commerce has documented that consumers increasingly rely on mobile platforms to shop online, with the average consumer spending more than $2,800 per year on e-commerce — a figure that continues to rise. Convenience, affordability, and the ease of price comparison have led more customers to visit online stores before brick-and-mortar locations. Recent research by Leanplum found that 90% of consumers purchase at least half of their gifts online. Millennials and Gen Z, in particular, favor online shopping for its convenience and discounts, driving retailers to adopt more strategic website designs. The same survey revealed that 80% of respondents shop directly from their mobile devices. Yet as technology evolves at a rapid pace, it is critical to consider the factors that can either facilitate or impede adoption and use by people with disabilities. [2]

7.      This is especially true with respect to accessing the internet by smartphone, where people with disabilities stand to benefit immensely if online services were fully and equally

---

[1] Pew Research Center, *Mobile Fact Sheet* (Nov. 20, 2025), https://www.pewresearch.org/internet/fact-sheet/mobile/ (reporting that 98% of Americans own a cellphone, smartphone ownership rose from 35% in 2011 to 98% in 2024, and 70% of adults are smartphone-only internet users).

[2] U.S. Chamber of Commerce, *Holiday Shopping and Consumer Trends Report* (Nov. 29, 2025), https://www.cbsnews.com/news/u-s-consumers-spent-a-record-11-8-billion-online-during-black-friday-sales/ (documenting increased reliance on mobile platforms and average annual consumer spending exceeding $1,800); Leanplum, *Survey Shows Nearly All U.S. Consumers Plan Majority of Holiday Shopping Online* (Nov. 22, 2025).

accessible. The National Federation of the Blind explains that, in many ways, individuals with disabilities rely on web content even more than their nondisabled peers because of inherent barriers in transportation, communication, and other areas. A blind person does not have the same autonomy to drive to a covered entity's office as a sighted person. A deaf or hard-of-hearing individual does not have the same opportunity to call that office. A person with an intellectual disability may not be able to interact independently with staff at such an office. By contrast, the 24-hour availability of information and transactions on websites and mobile apps provides a level of independence and convenience that cannot be replicated through any other means. This is why the number of Americans who rely on the internet has steadily increased year after year, and why entities continue to offer information and transactions through this unique medium.

8.    When digital content is properly formatted, it is universally accessible to everyone. When it is not, the content provider fails to communicate effectively with individuals who have visual disabilities. As a result, these individuals must expend additional time and effort to overcome communication barriers not faced by sighted users. This often requires the assistance of third parties and, in some cases, denies outright access to the online service.

9.    Unfortunately, Defendant fails to communicate effectively with consumers who are blind or visually impaired because its digital properties — including www.buckmason.com and the web pages that link to its retail stores — are not programmatically perceivable, operable, or otherwise properly formatted for use with assistive technologies. These communication barriers deprive consumers with visual disabilities, including Plaintiff Richard Johnson, of the ability to obtain information about Defendant's products, determine availability, compare prices, and use Defendant's online services — all of which remain readily available to sighted persons.

4

10.     This action seeks to remedy that discrimination and inequality.

11.     On multiple occasions in 2025 and 2026, Mr. Johnson attempted to access www.buckmason.com   using the screen-reader, NVDA to browse product collections, open individual product detail pages, review promotional banners, use the site search and category navigation, compare pricing, and complete purchases. His efforts included navigating product grids, attempting to identify available sizes and colors, attempting to add items to cart, and attempting to proceed to checkout using keyboard-only navigation and NVDA.

12.     During these attempts however, Mr. Johnson encountered numerous accessibility barriers that prevented NVDA from reading or interpreting essential content. These barriers included, without limitation: missing or placeholder alternative text on product and lifestyle images; aria-hidden containers that nonetheless contained focusable content and produced silence when focused; interactive controls and form elements lacking programmatic labels; empty, malformed, or improperly structured headings; broken and repeated links; empty *href* and *src* attributes; unlabeled iframes and carousels; and pricing and variant information that was not programmatically exposed. These defects disrupted reading order, obscured product details, and made it difficult or impossible for Mr. Johnson to understand or interact with key features of the Website.

13.     Subsequently, Plaintiff's counsel commissioned an independent manual audit of www.buckmason.com, ran automated scans using PowerMapper SortSite and WAVE, and retained an accessibility expert under a written retainer to perform manual testing and prepare an expert report. Representative findings from these combined assessments include placeholder or incorrect alt text on numerous pages; unlabeled ARIA controls; focusable content inside elements

marked aria-hidden="true"; empty or improperly structured headings; improper use of structural HTML elements; thousands of broken links (including repeated 400 and 404 errors); over 2,600 pages with empty href or src attributes; unlabeled carousels and interactive widgets; iframes lacking descriptive titles; and pricing information that does not programmatically distinguish original from discounted prices. These findings reflect pervasive coding and structural defects across product pages, category listings, promotional content, and navigation components.

14.    Buck Mason controls the design, coding, maintenance, and operation of www.buckmason.com and the content that links to its brick-and-mortar stores. The company is responsible for ensuring that its digital properties are perceivable, operable, and otherwise accessible to users who rely on assistive technology.

15.    Despite operating a national e-commerce platform and maintaining multiple retail locations, in New York alone, Buck Mason's Website contains numerous accessibility barriers documented across hundreds to thousands of pages. These issues appear in core shopping categories, product grids, promotional banners, navigation menus, and interactive components. The scope and recurrence of these defects indicate that accessibility considerations have not been consistently implemented at the template or design-system level.

16.    Because Mr. Johnson relies on NVDA to access online retail platforms, the presence of these barriers prevented him from independently browsing, reviewing, comparing, and selecting products on www.buckmason.com. Missing or placeholder alt text, unlabeled controls, broken links, inaccessible pricing and variant information, and improperly structured content impeded his ability to determine availability, select correct sizes or colors, add items to cart, and complete purchases. Without accessible coding practices and template-level remediation,

he cannot use the Website in a meaningful or reliable way.

17.    Mr. Johnson sought to use www.buckmason.com  because it offers apparel, denim, outerwear, and accessories that he desired for personal use. On multiple occasions in 2025 and 2026, including November 15, 2025; November 20, 2025; and January 10, 2026, Mr. Johnson attempted to use www.buckmason.com  with NVDA to browse product collections, open product detail pages, review promotional banners, use the site search and category navigation, compare pricing, identify available sizes and colors, add items to his cart, and proceed to checkout. Mr. Johnson had previously received a cashmere polo made from Egyptian cotton from Buck Mason and found it to be the softest item in his wardrobe; he therefore sought to purchase additional items on his own but was repeatedly prevented from doing so by the Website's accessibility barriers.

18.    As a legally blind consumer, he cannot visually inspect product packaging, images, or printed materials and therefore depends on programmatically exposed product descriptions, images, size and color selectors, and pricing information to make informed purchasing decisions. When essential product information is conveyed visually but not programmatically, he cannot independently evaluate or purchase the items offered.

19.    Despite operating a large-scale e-commerce platform with extensive digital infrastructure, the website contains numerous accessibility barriers documented across thousands of pages. These issues appear in core shopping categories, product grids, promotional banners, navigation menus, and interactive components. The volume and distribution of these barriers indicate that accessibility considerations have not been consistently implemented across the site's design and content.

## JURISDICTION AND VENUE

20.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12182 because Plaintiff's claims arise under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, et seq.

21.    This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims, including those under the New York State Human Rights Law, Article 15 (Executive Law § 290 et seq.) ("NYSHRL"); the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq., ("NYCHRL") and § 296 et seq.; and the New York State Civil Rights Law, Article 4, §§ 40-c and 40-d ("NYCRL").

22.    Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c) because Defendant BUCK MASON conducts substantial, continuous, and systematic business within this District through its highly interactive, public-facing website, www.buckmason.com, Plaintiff repeatedly accessed and attempted to use the Website from his residence in Bronx County, which lies within the Southern District of New York ("SDNY"). A significant portion of the discriminatory conduct giving rise to this action—including the denial of equal access to Defendant's online information and services—occurred within this District.

23.    Defendant is registered to do business in New York State and has been conducting business in New York, including within this District. Defendant participates in New York's economic life by performing business over the Internet and which offers nationwide access to apparel, denim, outerwear, and accessories that he purchases for personal use. The website functions as a primary platform for browsing products, reviewing descriptions, comparing prices,

accessing promotions, and completing purchases. Through www.buckmason.com, Defendant knowingly and repeatedly transmits digital content, files, and data to consumers in Bronx and New York County. Courts have consistently held that such purposeful, repeated online commercial activity constitutes sufficient minimum contacts for personal jurisdiction. See *Reed v. 1-800-Flowers.com, Inc.,* 327 F. Supp. 3d 539 (E.D.N.Y. 2018)**;** *Andrews v. Blick Art Materials, LLC*, 286 F. Supp. 3d 365 (E.D.N.Y. 2017)**;** *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court,* 592 U.S. ___ (2021)**;** *South Dakota v. Wayfair, Inc.,* 585 U.S. ___ (2018)**;** *Godfried v. Ford Motor Co.,* 2021 U.S. Dist. LEXIS 87012 (D. Me. May 6, 2021)**;** *Romero v. 88 Acres Foods, Inc.,* 2022 U.S. Dist. LEXIS 9040 (S.D.N.Y. Jan. 18, 2022)**;** *Sanchez v. NutCo, Inc.,* 2022 U.S. Dist. LEXIS 51247 (S.D.N.Y. Mar. 22, 2022)**;** *Panarra v. HTC Corp.*, No. 6:20-cv-6991 (W.D.N.Y. Apr. 15, 2022)**.**

24.     Thus, jurisdiction and venue are appropriate in this District because Plaintiff resides here, accessed the Website from within this District, and suffered injury here. Courts within this Circuit have consistently held that website accessibility barriers encountered by users within the District provide a sufficient basis for personal jurisdiction over out-of-state website operators whose digital platforms target or serve New York consumers.

## THE PARTIES

25.     Plaintiff, RICHARD JOHNSON, is and was at all relevant times a resident of New York County, New York.

26.     Plaintiff is legally blind and visually impaired, qualifying as an individual with a disability under the Americans with Disabilities Act, 42 U.S.C. § 12102(1)–(2), its implementing regulations at 28 C.F.R. §§ 36.101 et seq., the New York State Human Rights Law, and the New

York City Human Rights Law. Medical evaluations documenting his visual impairment include a low-vision evaluation dated September 10, 2024, and an ophthalmology report dated April 12, 2025, describing advanced retinal disease and visual acuity and field loss that meet the statutory definition of legal blindness. He is unable to read standard print or visually interpret digital interfaces and relies on screen-reading software to access online content and complete transactions independently.

27.    Upon information and belief, Buck Mason, Inc. is a retail company that operates the national e-commerce platform at www.buckmason.com and maintains brick-and-mortar retail locations. Buck Mason controls the design, coding, maintenance, and content of its Website and is responsible for the digital architecture, product listings, promotional materials, and interactive features that appear on the site.

28.    Buck Mason's Website is a central component of its business model. The Website provides product discovery, detailed descriptions, pricing information, customer reviews, promotional offers, and online purchasing capabilities to consumers nationwide, including residents of New York.

## NATURE OF ACTION

29.    This action arises under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.,* challenging Defendant's operation of a public-facing commercial website that denies blind and visually impaired individuals full and equal access to its goods, services, and digital content. Plaintiff, a legally blind resident of this District, attempted to access Defendant's website using screen-reading software but encountered multiple, programmatically detectable access barriers that prevented meaningful engagement with its products and services. Defendant's

10

failure to design, construct, and maintain its website in accordance with the Web Content Accessibility Guidelines ("WCAG") 2.1 Level AA constitutes unlawful discrimination and violates federal accessibility standards.

30.    The Internet has become an essential tool for daily life, serving as a primary means of obtaining healthcare information, researching medical conditions, accessing pharmaceutical guidance, communicating with providers, and navigating essential goods and services. This is true for sighted individuals and blind or visually impaired individuals alike. For blind consumers, accessible websites are not a convenience—they are a **necessity** for independent living, informed healthcare decision-making, and equal participation in modern commerce.

31.    Blind and visually impaired individuals access websites using keyboards in conjunction with screen-reading software that vocalizes visual content or displays it on a refreshable Braille device. This technology is the only method by which blind individuals can independently navigate the Internet. Unless websites are properly coded to interface with screen-reading software, blind users cannot perceive or interact with the information, products, or services offered online.

32.    Users of Windows-enabled computers have access to several screen-reading programs, including Job Access With Speech ("JAWS"), which is commercially available, and NonVisual Desktop Access ("NVDA"), which is open-source. These tools are indispensable for blind users and represent the only means by which they can independently navigate the Internet.

33.    Plaintiff Richard Johnson is blind and visually impaired and is a member of a protected class under the ADA, 42 U.S.C. § 12102(1)–(2), its implementing regulations at 28 C.F.R. §§ 36.101 et seq., the New York State Human Rights Law, and the New York City Human

Rights Law. Due to advanced macular degeneration complicated by retinal detachment, Plaintiff suffers from profound central vision loss, dense scotomas, and markedly reduced contrast sensitivity. He is unable to read standard print or visually interpret digital interfaces and relies exclusively on the NVDA screen-reading program to access digital content, including e-commerce websites such as Defendant's.

34.     For screen-reading software to function, website content must be capable of being rendered into text. If the underlying code fails to support this conversion, blind users are unable to access the same content available to sighted users. As explained in *Andrews v. Blick Art Materials, LLC*, 286 F. Supp. 3d 365, 375 (E.D.N.Y. 2017), screen-reading software "translates the visual Internet into an auditory equivalent," allowing blind users to navigate websites through auditory cues rather than visual ones. When websites lack proper coding, these cues disappear, rendering the site unusable. According to the American Foundation for the Blind, approximately twenty-six million American adults report significant visual impairment, underscoring the widespread need for accessible digital design.

35.     The World Wide Web Consortium ("W3C") has published WCAG 2.0 and 2.1, internationally recognized standards for digital accessibility. These guidelines are widely adopted by private entities and government agencies, including the U.S. Department of Justice, and have been repeatedly recognized by federal courts as the appropriate benchmark for ADA compliance.

36.     Non-compliant websites pose recurring and predictable barriers to blind and visually impaired users. Common violations include, but are not limited to:

a. Missing text equivalents for non-text elements;

b. Unlabeled frames and navigation regions;

c. Scripts without accessible alternatives;

d. Inaccessible forms and input fields;

e. Content conveyed solely through visual presentation;

f. Inability to resize text without loss of functionality;

g. Time limits that cannot be adjusted or disabled;

h. Missing or ambiguous page titles;

i. Links lacking descriptive context;

j. Keyboard focus indicators that are not discernible;

k. Undetectable default language settings;

l. Components that trigger unexpected context changes;

m. Settings that alter context without user notice;

n. Input fields lacking labels or instructions, including inaccessible CAPTCHA prompts;

o. Improperly nested markup, duplicate attributes, and non-unique IDs;

p. Inaccessible Portable Document Format (PDF) files;

q. User interface elements whose roles, states, and values cannot be programmatically determined or conveyed to assistive technology.

<u>STATEMENT OF FACTS</u>

37.    Plaintiff Richard Johnson is a legally blind consumer residing in Bronx County, New York. Due to proliferative diabetic retinopathy (P.D.R.) complicated by retinal detachment, Mr. Johnson experiences profound central vision loss, dense scotomas, and markedly reduced contrast sensitivity, and he is unable to read standard print or visually interpret digital interfaces.

As documented in the New York State Low Vision Evaluation Report dated September 10, 2025, "Richard Johnson is currently residing in an assisted living facility in the Bronx, NY, and is awaiting approval for a home health aide and physical therapy services," and the report identifies his condition as "Proliferative Diabetic Retinopathy (PDR)." Mr. Johnson relies exclusively on the NVDA screen-reading program to access digital content, including e-commerce websites such as Defendant's. (See Exhibit A.)

38.    On multiple occasions in 2025 and 2026, including November 15, 2025; November 20, 2025; and January 10, 2026, Mr. Johnson attempted to use www.buckmason.com with NVDA to browse product collections, open product detail pages, review promotional banners, use the site search and category navigation, compare pricing, identify available sizes and colors, add items to his cart, and proceed to checkout. Mr. Johnson had previously received a cashmere polo made from Egyptian cotton from Buck Mason and found it to be the softest item in his wardrobe; he therefore sought to purchase additional items on his own but was repeatedly prevented from doing so by the Website's accessibility barriers.

39.    During these visits, Mr. Johnson attempted to access product information for items he intended to purchase, including specialty apparel (for example, Japanese loomstate selvedge jeans and specific shirts and jackets) offered through Buck Mason's platform. He sought to review product descriptions,  customer reviews, pricing, and variant availability to determine whether the products met his needs.

40.    While attempting to access these products, Mr. Johnson encountered numerous accessibility barriers that prevented NVDA from reading or interpreting essential content. These barriers included missing or placeholder alternative text on product images; aria-hidden containers

14

that nonetheless contained focusable content and produced silence when focused; interactive controls and form elements lacking programmatic labels; empty, malformed, or improperly structured headings; broken and repeated links; empty href and src attributes; unlabeled iframes and carousels; carousels and interactive widgets lacking proper labeling; and pricing and variant information that was not programmatically exposed. These defects disrupted reading order, obscured product details, and made it difficult or impossible for Mr. Johnson to understand or interact with key features of the Website.

41.     The accessibility barriers occurred at the exact interface points Mr. Johnson needed to use to evaluate and purchase products. Product tiles and images frequently lacked meaningful alternative text or contained generic labels such as "image" or "button," preventing NVDA from conveying which product was being selected or which variant was available. Unlabeled "Add to Bag" buttons, quantity selectors, auto-ship options, and dropdown menus prevented him from adding items to cart or confirming configurations. Filters, search results, and navigation headings that were out of order or non-descriptive impeded his ability to refine searches and locate desired items.

42.     Independent automated and manual audits of www.buckmason.com conducted by counsel's ADA compliance team corroborate Mr. Johnson's experience and identify systemic, template-level failures across the site. Counsel ran PowerMapper SortSite scans and WAVE evaluations and retained an accessibility expert under a written retainer to perform targeted manual testing and prepare an expert report. The SortSite scans documented pervasive defects, including aria-hidden containers that contain focusable content on approximately 1,438 pages; elements with roles that hide child elements but nonetheless contain focusable children on roughly 613 pages;

numerous placeholder or non-descriptive alt attributes and other missing image accessible names (reported on dozens of product and lifestyle pages); links and interactive controls lacking accessible names (reported on more than 100 pages); repeated and ambiguous link text across many pages; and widespread broken links and HTTP errors identified in the broken-link report (including repeated 400 errors to external social links) affecting dozens to hundreds of pages. The WAVE evaluation of representative pages (including the homepage) found 18 accessibility errors, 8 contrast issues, and an overall AIM score of 5.2, corroborating the automated findings and highlighting additional ARIA and form-labeling problems that require manual verification. Together, the SortSite and WAVE results, plus the expert's manual testing, show pervasive coding and structural defects across product pages, category listings, promotional content, navigation components, and checkout flows. The SortSite and WAVE reports and the expert's testing logs are attached as Exhibits B and C.

43.     The audit findings demonstrate that the defects are not isolated to a single page or product but are pervasive across product templates and site components, indicating that accessibility considerations have not been consistently implemented at the template or design-system level

44.     Because Mr. Johnson relies on NVDA to access online retail platforms, these barriers prevented him from independently reviewing product descriptions, ingredient lists, usage instructions, and pricing information for the items he sought. NVDA frequently announced silence, skipped essential content, or failed to identify interactive elements, making it difficult or impossible for him to understand or interact with the product pages.

45.     As a direct result of these barriers, Mr. Johnson was unable to independently

evaluate or purchase the products he sought on the dates alleged. The lack of accessible product information, combined with structural and navigational barriers, prevented him from completing the tasks he attempted during each visit.

46.    Buck Mason's curated assortment, including specialty apparel such as selvedge denim  is important to Mr. Johnson because these products are not consistently available through mainstream retailers or are offered in exclusive configurations on Buck Mason's platform. The Website is the primary channel where the full range of these products is available, making it the natural place for Mr. Johnson to research and purchase the items he uses in his daily routine.

47.    Because the accessibility barriers prevented Mr. Johnson from obtaining the information necessary to purchase the items he sought, he suffered a concrete and particularized injury: denial of full and equal access to Buck Mason's goods and services. That injury is traceable to the Website and is redressable by injunctive relief requiring template-level remediation, programmatic exposure of product and transactional data, and independent verification.

48.    Mr. Johnson intends to return to www.buckmason.com  once the accessibility barriers are remediated. If Buck Mason implements complete, durable, template-level remediation that programmatically exposes product images, variant and size controls, pricing, and checkout flows to NVDA users, Mr. Johnson will return to complete the purchases he sought and to continue shopping for additional items. He will do so both to obtain the goods he sought and to verify that the Website provides reliable, independent access for users who rely on assistive technology.

## CLASS ACTION ALLEGATIONS

49.    Plaintiff also seeks certification of a New York Subclass under Fed. R. Civ. P. 23(a) and 23(b)(2), defined as: All legally blind individuals residing in the State of New York who have

attempted to access www.buckmason.com and were similarly denied equal access to its offerings due to the same systemic accessibility barriers.

50.     Common questions of law and fact exist among the Class and Subclass, including but not limited to:

☐    Whether www.buckmason.com qualifies as a "public accommodation" under Title III of the ADA;

☐    Whether Defendant's Website constitutes a "place or provider of public accommodation" under the NYCHRL;

☐    Whether the Website's persistent accessibility barriers violate the ADA by denying blind users full and equal access to BUCK MASON's information, services, and digital content;

☐    Whether the same barriers violate the NYCHRL, NYCRL, and NYSHRL by excluding blind users from meaningful participation in the digital marketplace;

☐    Whether Defendant failed to adopt and implement accessibility policies consistent with **WCAG 2.1 Level AA**;

☐    Whether injunctive relief is warranted to remedy Defendant's ongoing violations.

51.     Plaintiff's claims are **typical** of the claims of the Class. Like other blind individuals, he relies on screen-reading software and keyboard navigation to access online platforms. He encountered the same systemic barriers—missing alternative text, inaccessible buttons, unlabeled form fields, broken ARIA references, improper heading structure, and mouse-dependent controls—that affect all Class members attempting to use Defendant's Website.

52.     Plaintiff will fairly and adequately represent the interests of the Class. He has retained counsel experienced in disability rights and complex class action litigation. Plaintiff has

18

no interests antagonistic to those of the Class and seeks injunctive and declaratory relief applicable to all members.

53.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendant has acted or failed to act on grounds generally applicable to the Class, warranting injunctive relief to remediate the website's accessibility barriers.

54.    Alternatively, certification is appropriate under Fed. R. Civ. P. 23(b)(3) because common questions of law and fact predominate over individual issues, and a class action is the most efficient and fair method for adjudicating these claims.

55.    Maintaining this action as a class proceeding will promote judicial economy by avoiding duplicative litigation and ensuring uniform relief for a class likely to include hundreds, if not thousands, of blind individuals who have attempted to use www.ancestry.comand faced exclusion.

## FIRST CAUSE OF ACTION
**(Violations of the ADA, 42 U.S.C. § 12182 *et seq.*)**

56.    Plaintiff, RICHARD JOHNSON, on behalf of himself and the Class Members, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

57.    Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 *et seq.,* provides:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

58.    Defendant's  Website that is offered as a link to the company is a service that is offered to the general public, and as such, must be equally accessible to all potential consumers.

59.    Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the products, services, facilities, privileges, advantages, or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

60.    Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, inter alia:

> [A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; [and] a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

42 U.S.C. § 12182(b)(2)(A)(ii)-(iii).

61.    The acts alleged herein constitute violations of Title III of the ADA and the regulations promulgated thereunder. Plaintiff, who is a member of a protected class of persons under the ADA, has a physical disability that substantially limits his major life activity of sight within the meaning of 42 U.S.C. §§ 12102(1)(A)-(2)(A). Furthermore, Plaintiff has been denied full and equal access to the Website, has not been provided services that are provided to other patrons who are not disabled, and has been provided services that are inferior to the services provided to non-disabled persons. Defendant has failed to take any prompt and equitable steps to remedy the discriminatory conduct as the violations are ongoing.

62.    Under 42 U.S.C. § 12188 and the remedies, procedures, and rights set forth and

20

incorporated therein, Plaintiff requests relief as set forth within the section **Prayer For Relief** below.

**SECOND CAUSE OF ACTION**
**(New York State Human Rights Law)**
**("NYSHRL")**

63.     Plaintiff, RICHARD JOHNSON on behalf of himself and the Class and New York City Sub-Classes Members, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

64.     At all times relevant to this action, the New York State Human Rights Law ("NYSHRL"), Article 15 of the New York Executive Law §§ 290 *et seq.*, covers the actions of the Defendants.

65.     Plaintiff, at all times relevant to this action, as a result of his loss of vision, has a substantial impairment to a major life activity and is an individual with a disability under Article 15 of N.Y. Executive Law § 292(21).

66.     Defendant Buck Mason, Inc., at all relevant times, owned and operated a place of public accommodation—the subject website, www.buckmason.com — and also owned, operated, and maintained brick-and-mortar retail outlets, including multiple retail locations in New York City and elsewhere in New York State, within the meaning of Article 15 of N.Y. Executive Law § 292(9). Defendant is a "person" within the meaning of Article 15 of N.Y. Executive Law § 292(1).

67.     Plaintiff has visited the Website on a number of occasions and has encountered

21

barriers to his access that exist.

68.    Under Article 15 N.Y. Executive Law § 296(2)(a) "it shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation ... because of the ... disability of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof."

69.    Discrimination includes the refusal to adopt and implement reasonable modifications in policies, practices, or procedures when they are necessary to afford facilities, privileges, advantages, or accommodations to individuals with disabilities. Article 15 of N.Y. Executive Law § 296(2)(a), § 296(2)(c)(i).

70.    Defendant's actions violate Article 15 of N.Y. Exec. Law § 296(2)(a) by discriminating against the Plaintiff and Subclass by (i) owning and operating a website that is inaccessible to disabled individuals who are sight-impaired and cannot discern the content thereof without the use of a screen-reading program; (ii) by not removing access barriers to its Website in order to make accessibility features of the sites known to disabled individuals who are sight-impaired; and (iii) by refusing to modify the Website when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities.  This inaccessibility denies disabled individuals who are sight-impaired full, and equal access to the facilities, goods, and services that the Defendant makes available to individuals who are not disabled and can see without the need of a screen-reading program or other similar device.  Article 15 of N.Y. Exec. Law § 296(2)(c).

71.    The Defendant's discriminatory practice also includes, "a refusal to take such steps

as may be necessary to ensure that no individual with a disability is excluded or denied services because of the absence of auxiliary aids and services, unless such person can demonstrate that taking such steps would fundamentally alter the nature of the facility, privilege, advantage or accommodation being offered or would result in an undue burden." Article 15 of N.Y. Exec. Law § 296(2)(c).

72.    Established guidelines exist for making websites accessible to disabled individuals. The International Website Standards Organization, the Worldwide Consortium, known throughout the world as "W3C," has published version 2.1 of the Web Content Accessibility Guidelines ("WCAG 2.1").  WCAG 2.1 is well-established guideline for making websites accessible to the blind and visually impaired people. These guidelines are universally followed by most large business entities and government agencies to ensure websites are accessible.

73.    Defendant has intentionally and willfully discriminated against the Plaintiff and Subclass and violation of the New York State Human Rights Law, Article 15 of N.Y. Exec. Law § 296(2) and the discrimination continues to date.

74.    Absent injunctive relief, Defendant's discrimination will continue against Plaintiff and Subclass, causing irreparable harm.

75.    Plaintiff and the Subclass are therefore entitled to compensatory damages, civil penalties, and fines for every discriminatory act in addition to reasonable attorney fees and costs and disbursements of this action. Article 15 of N.Y. Exec. Law §§ 297(9), 297(4)(c) *et seq.*

## <u>THIRD  CAUSE OF ACTION</u>
**(Violation of New York State Civil
Rights Law) ("NYCRL")**

76.    Plaintiff, RICHARD JOHNSON, on behalf of himself and the New York City

Subclass Members, repeats and realleges every allegation of the preceding paragraphs as if fully

set forth herein.

77.    Plaintiff served notice thereof upon the New York State Attorney General, as

required by N.Y. Civil Rights Law § 41. (Exhibit 1) (Notice to Attorney General)

78.    Persons within New York State are entitled to full and equal accommodations,

advantages, facilities, and privileges of places of public accommodations, resort or amusement,

subject only to the conditions and limitations established by law and applicable alike to all persons.

No person, being the owner of a place of public accommodation, shall directly or indirectly refuse,

withhold from, or deny to any person any of the accommodations, advantages, facilities, and

privileges thereof. N.Y. Civ. Rights Law § 40.

79.    No person because of disability, as defined in § 292(21) of the Executive Law, shall

be subjected to any discrimination in his or her civil rights by person or by any firm, corporation,

or institution, or by the state or any agency or subdivision. N.Y. Civ. Rights Law ("NYCRL") §

40-c.

80.    § 292 of Article 15 of the N.Y. Executive Law deems a disability a physical,

mental, or medical impairment resulting from anatomical, physiological, genetic, or neurological

conditions that prevent the exercise of a normal bodily function. As such, the Plaintiff is disabled

under the N.Y. Civil Rights Law.

81.    Defendant discriminates against the Plaintiff and Subclass under NYCRL § 40 as

Defendant's Website is a place of public accommodation that does not provide full and equal accommodation, advantages, facilities, and privileges to all persons and discriminates against disabled individuals who are sight impaired.

82.    Defendant intentionally and willfully failed to remove the barriers on their Website, discriminating against the Plaintiff and Subclass preventing access in violation of NYCRL § 40.

83.    Defendant has failed to take any steps to halt and correct its discriminatory conduct and discriminate against the Plaintiff and the Subclass members.

84.    Under N.Y. Civil Rights Law § 41, "a corporation which violates any of the provisions of §§ 40, 40-a, 40-b or 42 shall be liable for a penalty of not less than one hundred dollars nor more than five hundred dollars, to be recovered by the person aggrieved thereby… in any court of competent jurisdiction in the county in which the plaintiff or defendants shall reside." *Id...*

85.    Plaintiff and the SubClass hereby demand compensatory damages of five hundred dollars ($500.00) for the Defendant's acts of discrimination, including civil penalties and fines under N.Y. Civil Law § 40 *et seq.*

## <u>FOURTH CAUSE OF ACTION</u>
### (Violations of the New York City Human Rights Law)
### ("NYCHRL")

86.    Plaintiff, RICHARD JOHNSON, on behalf of himself and the New York City Sub-Class Members, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

87.    N.Y.C. Administrative Code § 8-107(4)(a) provides that "It shall be an unlawful discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee,

proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation: [b]ecause of any person's . . . disability . . . directly or indirectly: [t]o refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation".

88.    Defendant is subject to NYCHRL because it owns and operates the Website, www.buckmason.com  making it a "person" within the meaning of N.Y.C. Admin. Code § 8-102(1).

89.    Defendant violates N.Y.C. Administrative Code § 8-107(4)(a) in refusing to update or remove access barriers to Defendant's Website, causing the Website and the services integrated completely inaccessible to the blind. This inaccessibility denies blind patrons full and equal access to the facilities, products, and services that Defendant makes available to the non-disabled public.

90.    Defendant is required to "make reasonable accommodation to the needs of persons with disabilities . . . any person prohibited by the provisions of [§ 8-107 *et seq.*] from discriminating based on disability not to provide  a reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job or enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." N.Y.C. Admin. Code § 8-107(15)(a).

91.    Defendant's actions constitute willful intentional discrimination against the Sub-Class based on a disability in violation of the N.Y.C. Administrative Code § 8107(4)(a) and § 8-107(15)(a), in that Defendant has:

    a.    constructed and maintained a Website that is inaccessible to blind class

members with knowledge of the discrimination; and/or

b.      constructed and maintained a Website that is sufficiently intuitive and/or obvious that is inaccessible to blind class members; and/or

c.      failed to take actions to correct these access barriers in the face of substantial harm and discrimination to blind class members.

92.     Defendant has failed to take any prompt and equitable steps to remedy the discriminatory conduct as these violations are ongoing.

93.     As such, Defendant discriminates and will continue in the future to discriminate against Plaintiff and other members of the proposed class and subclass based on disability in the full and equal enjoyment of the products, services, facilities, privileges, advantages, accommodations and/or opportunities of the Website under N.Y.C. Administrative Code § 8-107(4)(a). Unless the Court enjoins Defendant from continuing to engage in these unlawful practices, Plaintiff and members of the Class will continue to suffer irreparable harm.

94.     Defendant's actions were to violate the NYCHRL, and therefore, Plaintiff invokes the right to injunctive relief to remedy the discrimination.

95.     Plaintiff is also entitled to compensatory damages, as well as civil penalties and fines under N.Y.C. Administrative Code § 8-120(8) and § 8-126(a) for each offense as well as punitive damages pursuant to § 8-502.

96.     Plaintiff is also entitled to reasonable attorneys' fees and costs.

97.     Under N.Y.C. Administrative Code § 8-120 and § 8-126 and the remedies, procedures, and rights set forth and incorporated therein Plaintiff prays for judgment as set forth below.

**FIFTH CAUSE OF ACTION**

**(Declaratory Relief)**

98.    Plaintiff, RICHARD JOHNSON, on behalf of himself and the Class and New York City Sub-Class Members, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

99.    An actual controversy has arisen and now exists between the parties in that Plaintiff contends, and is informed and believes that Defendant denies, that the Website contains access barriers denying blind customers the full and equal access to the products, services and facilities of the Website, which Defendant owns, operates and controls, fails to comply with applicable laws including, but not limited to, Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12182, *et seq.*, and N.Y.C. Admin. Code § 8-107, *et seq.*, prohibiting discrimination against the blind.

100.    A judicial declaration is necessary and appropriate at this time so that each of the parties may know its respective rights and duties and act accordingly.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

a.    A preliminary and permanent injunction to prohibit Defendant from violating the Americans with Disabilities Act, 42 U.S.C. §§ 12182, et seq., N.Y.C. Administrative Code § 8-107, et seq., and the laws of New York;

b.    A preliminary and permanent injunction requiring Defendant to take all the steps necessary to make the Website fully compliant with the requirements set forth in the ADA, and the implementing regulations, so that the Website is readily accessible to and usable by blind individuals;

c.    A declaration that Defendant owns, maintains and/or operates the Website in a manner that discriminates against the blind and which fails to provide access for persons with disabilities as required by Americans with Disabilities Act, 42 U.S.C. §§ 12182, et seq., N.Y.C. Administrative Code § 8-107, et seq., and the laws of New York;

d.    An order certifying the Class and Sub-Classes under Fed. R. Civ. P. 23(a) & (b)(2) and/or (b)(3), appointing Plaintiff as Class Representative, and Plaintiff's attorneys as Class Counsel;

e.    Compensatory damages in an amount to be determined by proof, including all applicable statutory and punitive damages and fines, to Plaintiff and the proposed class and subclasses for violations of civil rights under New York City Human Rights Law, the New York State Human Rights Law and the New York State Civil Rights Law;

f.    Pre-judgment and post-judgment interest;

g.    An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

h.    Such other and further relief as this Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all questions of fact the Complaint raises.


Dated: New York, New York
       February 10, 2026

Respectfully submitted,
**JOSEPH & NORINSBERG, LLC**

*/s/ Robert Schonfeld*
Robert Schonfeld, Esq
*Attorneys for Plaintiff*
825 Third Avenue, Suite 2100
New York, New York 10022
Tel. No.: (212) 227-5700
Fax No.: (212) 656-1889
rschonfeld@employeejustice.com